Argued and submitted November 5, 2007, decision of Court of Appeals reversed; rule held valid March 27, 2008

Larry WOLF,
an Oregon elector
and president of the Oregon Education Association,
Varner Seaman, Maureen Crawford
and Nicholas Blosser,
*Respondents on Review,*

*v.*

OREGON LOTTERY COMMISSION
and Commissioners Kerry Tymchuk,
Bruce Andrews, Stan Robson,
and Richard Solomon,
in their official capacities,
*Petitioners on Review.*

(CA A125420; SC S054681)

182 P3d 180

Denise G. Fjordbeck, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for petitioners on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Margaret S. Olney, of Smith, Diamond & Olney, Portland, argued the cause and filed the brief for respondents on review.

Before De Muniz, Chief Justice, and Gillette, Durham, Balmer, Kistler, and Walters, Justices.**

GILLETTE, J.

** Linder, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

Under Oregon law, any person dissatisfied with an administrative rule promulgated by an Oregon administrative agency may challenge the validity of that rule in an original proceeding filed in the Court of Appeals. ORS 183.400.[1] This is such a case. The Oregon Lottery Commission (the Lottery), after notice and a series of hearings, promulgated a rule, *former* OAR 177-040-0026 (2004), dealing with the payments that the Lottery would make to businesses (called "retailers") that make video lottery games available to the public.[2] Among other things, the rule provided that "[t]he compensation amount the Lottery shall pay to a retailer for

---

[1] ORS 183.400 is set out in the text, 344 Or at 348-49.

[2] The rule provided:

"(1) The compensation amount the Lottery shall pay a retailer for the sale of video lottery game shares is calculated on a percentage of net receipts during a business year. 'Net receipts' means the amount of money that is received at a retailer's premises from the sale of video lottery game shares after the payment of prizes. At the time a retailer signs a Retailer Contract, the retailer must choose in writing to receive compensation in accordance with either subsection (a) or subsection (b) of this section. If the retailer fails to choose as required, the Lottery shall compensate the retailer pursuant to subsection (a) of this section for the first business year the contract is in effect. For each subsequent business year the contract is in effect, no less than 60 days before the beginning of the upcoming business year, the retailer may submit a written notice to the Lottery that the retailer chooses to be compensated under the alternative compensation method for the upcoming business year. If the retailer does not submit or fails to timely submit a written notice, the Lottery shall compensate the retailer using the retailer's current compensation method for the next business year.

"(a) 3-Tier Option:

**Net Receipts per Year—Compensation—Percent of Net Receipts**
up to $175,000—32.5%
$175,000 to $475,000—26%
$475,000 and up—17%
For example, if a retailer's annual net receipts are $600,000, the retailer would receive over the course of the business year: 32.5% of the first $175,000 ($56,875), and 26% of the next $300,000 ($78,000), and 17% of the remaining $125,000 ($21,250), for a total of $156,125.

"(b) 2-Tier Option:

**Net Receipts per Year—Compensation—Percent of Net Receipts**
up to $650,000—26%
$650,000 and up—19%
For example, if a retailer's annual net receipts are $1,000,000, the retailer would receive over the course of the business year: 26% of the first $650,000 ($169,000), and 19% of the remaining $350,000 ($66,500), for a total of $235,500.

the sale of video lottery game shares is calculated on a percentage of net receipts during a business year." The rule established two options for payment, with retailers empowered to select which option they wished to use. Petitioners challenged the rule on the ground, among others, that the Lottery did not have statutory authority to promulgate the rule. A panel of the Court of Appeals agreed, and invalidated the rule. *Wolf v. Oregon Lottery Commission*, 209 Or App 670, 149 P3d 303 (2006). We allowed the Lottery's petition for review and now reverse the decision of the Court of Appeals.

The statute that controls the outcome of this case is ORS 183.400, which sets out the procedure for mounting a facial challenge to administrative rules and describes the scope of judicial review. That statute provides:

"(1) The validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases. The court shall have jurisdiction to review the validity of the rule whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, but not when the petitioner is a party to an order or a contested case in which the validity of the rule may be determined by a court.

"(2) The validity of any applicable rule may also be determined by a court, upon review of an order in any manner provided by law or pursuant to ORS 183.480 or upon enforcement of such rule or order in the manner provided by law.

"(3) Judicial review of a rule shall be limited to an examination of:

"(a) The rule under review;

"(b) The statutory provisions authorizing the rule; and

---

"(2) The compensation rates for the sale of video lottery game shares set forth in this rule are limited to compensation for the sale of shares for video poker games as described in OAR 177-200-0070."

The foregoing rule has since been renumbered as OAR 177-040-0027, and its scope now is limited to video poker retailers, rather than to the broader spectrum of retailers who offered various Lottery games to the public at the time that the former rule was adopted. However, with respect to video poker retailers, the issues the Court of Appeals addressed in this case remain viable.

"(c)   Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures.

"(4)   The court shall declare the rule invalid only if it finds that the rule:

"(a)   Violates constitutional provisions;

"(b)   Exceeds the statutory authority of the agency; or

"(c)   Was adopted without compliance with applicable rulemaking procedures.

"(5)   In the case of disputed allegations of irregularities in procedure which, if proved, would warrant reversal or remand, the Court of Appeals may refer the allegations to a master appointed by the court to take evidence and make findings of fact. The court's review of the master's findings of fact shall be de novo on the evidence.

"(6)   The court shall not declare a rule invalid solely because it was adopted without compliance with applicable rulemaking procedures after a period of two years after the date the rule was filed in the office of the Secretary of State, if the agency attempted to comply with those procedures and its failure to do so did not substantially prejudice the interests of the parties."

The Court of Appeals began its analysis by observing that, in this case, in challenging the Lottery's rule, petitioners do not contend that the Lottery violated rulemaking procedures; they confine themselves to arguing that the rule exceeded the Lottery's statutory authority, and that it violated the provision of Article XV, section 4(3), of the Oregon Constitution that dictates how the Lottery must spend its proceeds. *Wolf,* 209 Or App at 672. The court then briefly examined the terms of the challenged rule, which included a tiered compensation scheme that bases compensation on a percentage of net revenues. *Id.* at 673-74.

Turning first to the subconstitutional question, *see Planned Parenthood Assn. v. Dept. of Human Res.,* 297 Or 562, 564-65, 687 P2d 785 (1984) (describing proper sequence for analyzing challenges to administrative rules), the Court of Appeals focused its analysis on ORS 461.445, the statute that authorizes the Lottery to enact rules like the one in question. That statute provides:

> "In establishing its schedule of payments to contractors, the Oregon State Lottery Commission *shall undertake to develop a system that maximizes the net revenue to the state for the public purpose consistent with providing a reasonable rate of return* for contractors."

(Emphasis added.) The pivotal phrase, the court noted, was the direction to "undertake to develop" the system contemplated by the statute. *Wolf*, 209 Or App at 674. The Lottery had argued that the word "undertake," which is central to that phrase, means "attempt," so that the statutory directive to the Lottery is to attempt to create a schedule of payments to contractors that "maximizes the net revenue to the state," while providing a "reasonable rate of return" to contractors.

■      The Court of Appeals rejected the Lottery's view because, it said, to accept that view would render the statute "hortatory." *Id.* at 674. Noting that the word "undertake" has a vast array of other meanings beyond "attempt" (such as "guarantee," "promise," "contract," and "covenant"), the Court of Appeals concluded that the word must have a substantive connotation and that the dictionary did not provide an answer. Instead, the court stated,

> "[a] more meaningful method of interpreting the term is to ask whether the legislature would enact operative legislation (as opposed to a general, introductory policy statement preceded by a 'whereas' clause or its functional equivalent) containing explicit, substantive standards (such as 'maximize[ ] the net revenue' and 'reasonable rate of return'), couched in mandatory terms ('*shall* undertake'), if the legislature's intention was merely to give advice. We conclude that, in context, the term 'undertake' imposes a genuine mandate. The Lottery is charged with the duty to develop a system, and to do so subject to an express constraint: to maximize state revenue consistent with providing retailers a reasonable rate of return."

*Id.* at 675 (emphasis in original). For that reason, the Court of Appeals rejected the Lottery's argument—that ORS 461.445 merely directs the Lottery to make an effort to devise a system that would maximize net revenues, while providing a reasonable rate of return to retailers.

We do not agree with the Court of Appeals' analysis. It is true, of course, that the legislature, in enacting ORS 461.445, intended to require that the Lottery "establish a compensation system" by rule. But when one views the statute in its entirety, it becomes clear that the word "undertake," as used in the statute, must mean "attempt."

Under ORS 461.445, the Lottery is to "undertake to develop a system" that has two goals, *viz.*, "maximiz[ing] the net revenue to the state" and "providing a reasonable rate of return" to retailers. In that context, the outcome—a "system"—is to be the result of a process—"develop[ment]"—by the Lottery that harmonizes two competing goals. Moreover, interplay of those two goals will differ to some degree for each of the hundreds of retailers with whom the Lottery deals. (Each has different costs in rent, taxes, personnel, and physical facilities, to name only the most obvious examples. Moreover, each of those factors may vary to some degree for each retailer from year to year.) Yet the Lottery's "system" is to be imposed by a set of *rules*, which are quasi-legislative policy choices of general applicability. *See* ORS 183.310(9) (defining "rule"). Such rules will, of necessity, affect some retailers differently than others. No system is possible that precisely strikes the statutory balance as to *every* retailer. Therefore, the statute cannot mean that the Lottery "guarantees," "promises," "contracts," or "covenants" to produce such a system.[3] The Lottery must seek to achieve the goals listed in ORS 461.445, but the validity of any "system" the Lottery creates through rules is not contingent upon its meeting the two competing goals *vis-à-vis* each and every retailer. It follows,

---

[3] The Court of Appeals implicitly recognized that point when it rejected petitioners' argument that the statute did not permit the Lottery to balance the competing interests of retailers against revenues to the state but, rather, required it to maximize revenue by selecting the lowest rate of return for retailers that would keep them operating the games. The Court of Appeals ultimately solved the problem this way:

"We * * * conclude that ORS 461.445 requires the Lottery to establish a retailer compensation system that balances two competing objectives: maximizing state revenue and providing retailers with a reasonable rate of return. In doing so, [however,] the Lottery is not obligated to establish a rate of return that is the lowest one that the market will sustain[, *i.e.*, one in which the retailers receive only so much as will cause them to continue to participate in the program]."

*Wolf*, 209 Or App at 676.

we believe, that the word "undertake," as used in ORS 461.445, can only mean "attempt," because the best that can be hoped for in a rule (or a series of rules) is a rough approximation of the specified goals. That is, it is the *attempt*, not the wholly accurate *outcome*, that the legislature has directed the Lottery to make.

The Court of Appeals, however, appears to have read that word as imposing a more demanding standard, and that, in our view, led to the Court of Appeals' misunderstanding of the scrutiny that it could apply to the system that the Lottery created.

That misunderstanding is reflected in its treatment of the concept of "rate of return"—a concept that had dominated petitioners' arguments. After consulting various texts and other sources, the court concluded that

> "the phrase 'rate of return' in the video lottery context means the profits received by a retailer from the proceeds of video lottery games—that is, the revenue minus the operating cost of providing those games (for example, labor)— expressed as a percentage of the total capital investment (for example, furniture or remodeling, or the opportunity cost of using space for lottery games instead of other revenue-generating uses). It follows that ORS 461.445 requires that the Lottery, in developing a compensation system for retailers, obtain and consider data not only on retailers' revenue, but also on their operating costs and capital investments."

*Wolf*, 209 Or App at 678.

The court also relied on another provision of the enactment that authorized the Lottery to permit video poker, but which had been included in the Oregon Revised Statutes as a note, rather than being codified: Oregon Laws 1991, chapter 62, section 13. Section 13(1) contemplated that the Commission would contract for an "outside review" of the cost of operating video lottery games and the manner in which revenue from the operation of those games was shared between retailers and the Lottery, with the review culminating with a report to the Lottery. Or Laws 1991, ch 962, § 13(1), *compiled as a note after* ORS 461.544 (1991) (so providing). The Court of Appeals took special notice of section

13(2), which provided, "After considering the findings and recommendations of this report, the lottery commission shall modify its provisions for the payments to contractors." The court announced that the text of section 13, read in context, *"required* the Lottery to measure retailers' compensation for providing video lottery games in terms of revenue, operating costs, and capital expenditures ('space * * * for the operation' of machines)." *Wolf*, 209 Or App at 678-79 (emphasis in original). Finally, after going beyond the words of the legislation itself and reviewing the legislative history, the Court of Appeals also stated that,

> "in using the term 'rate of return,' the legislature intended to assign to the Lottery the task of formulating a compensation system for retailers taking into account their revenues, operating costs, and total capital investment, in such a way as to provide a 'reasonable rate of return.' *Our remaining inquiry is whether the Lottery did so."*

*Id.* at 681 (emphasis added).

That last, emphasized statement illustrates the error in the Court of Appeals' analysis: As we have explained, the law required only that the Lottery *try* to achieve the statutory goals. By inquiring into whether the Lottery "did so," the Court of Appeals was asserting that the statute meant not that the Lottery was to *try*, but that it had to *succeed* at providing a reasonable rate of return. As we have explained, review by that standard asked more of the Lottery than the statute did. Having mistaken its role in scrutinizing the Lottery's rule, the Court of Appeals then turned to consider "the role that the rulemaking *record* can play in our inquiry." *Id.* (emphasis added). As we shall explain, the resulting inquiry also was erroneous.

The Court of Appeals acknowledged the limitations on judicial review set out in the text of ORS 183.400, the part of the Administrative Procedures Act that grants it the authority to consider facial challenges to agency rules. *Id.* at 682. As noted earlier, that statute provides, in part:

> "(3) Judicial review of a rule *shall be limited to an examination of*:
>
> "(a) The rule under review;

"(b)  The statutory provisions authorizing the rule; and

"(c)  Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures."

ORS 183.400(3) (emphasis added). The court also acknowledged this court's opinion in *AFSCME Local 2623 v. Dept. of Corrections,* 315 Or 74, 79, 843 P2d 409 (1992), where this court stated:

"Aside from questions that might arise concerning the facts surrounding the process of adopting a rule—questions not raised in this case—*judicial review under ORS 183.400 is limited to the face of the rule and the law pertinent to it.* Numerous individual fact situations can arise under any rule, but judicial review of the rule as applied to each of those situations is reserved to other forums."[4]

(Emphasis added.)

Nonetheless, the court rejected the Lottery's argument that, under those standards, the rulemaking record made before the Lottery commission in its deliberations over the appropriate content of *former* OAR 177-040-0026 (2004) was irrelevant to the court's judicial review function. The court stated, "Neither the statutes nor the cases construing them support the Lottery's position." *Wolf,* 209 Or App at 682. The court then undertook an extensive examination of both the evidence presented to the Lottery during the rulemaking process and the statements made by various Lottery commissioners at that time to determine whether the Lottery had created a system that met the statutory goals. And, based on that examination, the court concluded that *former* OAR 177-040-0026 (2004) bore "no discernable relationship" that that court could identify to the rate of return described in the governing statute. Therefore, the court held that the rule was invalid. *Wolf,* 209 Or App at 691-92.

---

[4] We note in passing that the phrase, "the face of the rule," means the wording of the rule when read in the context of the other rules of which it is a part. We did not mean to suggest by the use of that phrase in *AFSCME Local 2623* that the rule was to be read in isolation.

■     It was error for the court to consider the record in the way that it did, and further error to utilize that record as a justification for striking down the Lottery's rule. The governing statute, ORS 183.400(3), could not be phrased more plainly. The record on review (aside from information concerning whether the statutory procedures for rulemaking were followed, an issue not presented by this case) consists of two things only: the wording of the rule itself (read in context) and the statutory provisions authorizing the rule. ORS 183.400 (3)(a), (b). *See Planned Parenthood Assn.*, 297 Or at 572-74 (illustrating process). *See also* ORS 183.400(4)(a), (b) (court may declare rule invalid *"only if"* the rule violates a constitutional provision or "exceeds the statutory authority of the agency") (emphasis added).

■     This court's statement in *AFSCME Local 2623*, that judicial review is limited under ORS 183.400 to the face of the rule and the law pertinent to it, is precisely on point. Nothing in that decision invites a reviewing court to consider, in addition to the relevant statutes and the wording of the rule (read in context), particular evidence that was offered in the course of the rulemaking proceeding or the comments of individual rulemakers concerning that evidence and their thoughts about their rulemaking task. Indeed, an inquiry into the thinking processes of administrators and agency heads who were performing their quasi-legislative function as rulemakers is impermissible, given the limited scope of the issues under ORS 183.400(3).

It follows from the foregoing that the Court of Appeals should have limited its inquiry to the wording of the rule, read in context, and the applicable statute, ORS 461.445. When that is done, it becomes apparent that the rule passes the statutory test: The legislature directed the Lottery to attempt to establish a payment scheme that would maximize state revenues while providing contractors with a reasonable rate of return. *Former* OAR 177-040-0026 (2004) fulfilled the legislative directive. It is true that the rule did not speak either in terms of "maximizing revenue" or of "reasonable rate of return," but the absence of those phrases does not show that the Lottery was not following the statute. By regulating a contractor's net receipts from lottery games

shares, the rule necessarily established what revenues the Lottery would receive and, derivatively, what each retailer's particular rate of return would be. The rule was not facially invalid on the statutory ground urged by petitioners. The Court of Appeals' contrary conclusion was error.

The question arises concerning what disposition to make of this case. As noted, petitioners challenged the rule in question on both statutory and constitutional grounds. Because of its view of the case, the Court of Appeals did not need to address petitioners' constitutional challenge to the rule. Ordinarily, we now would remand the case to the Court of Appeals to address petitioners' constitutional arguments. However, both parties ask us to dispose of the remaining issue in this opinion. We believe that it is desirable to do so in this case.

■ We have considered petitioners' constitutional arguments. Petitioners assert that *former* OAR 177-040-0026 (2004) is invalid, because the rates set by the Lottery in that rule exceed permissible "costs of administration" of the Lottery, contrary to that requirement in Article XV, section 4(3), of the Oregon Constitution.[5] Petitioner's argument in this respect is doubly mistaken. First, the argument shares a flaw with petitioners' statutory arguments, *i.e.*, it assumes that the reviewing court can look behind the wording of the rule, read in context. That is not correct, as we already have explained. Second, the "costs of administration" mentioned in section 4(3), and on which petitioners rely, are the *Lottery*'s administrative costs. *See Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 567, 871 P2d 106 (1994) (so explaining). Therefore, they are *not* the costs of retailers that the Lottery's rule makes allowance for. Petitioners' constitutional arguments are not well taken in the context of a proceeding under ORS 183.400.

---

[5] Article XV, section 4(3), of the Oregon Constitution provides:

"There is hereby created the State Lottery Commission which shall establish and operate a State Lottery. All proceeds from the State Lottery, including interest, but excluding costs of administration and payment of prizes, shall be used for any of the following purposes: creating jobs, furthering economic development, financing public education in Oregon or restoring and protecting Oregon's parks, beaches, watersheds and critical fish and wildlife habitats."

The decision of the Court of Appeals is reversed. The rule is held valid.[6]

---

[6] Our holding in this case arises out of the limited scope of review allowed under ORS 183.400. We do not by our holding suggest that petitioners could not in the future seek relief under another procedure, such as a contested case, or through a declaratory judgment. *See, e.g.*, ORS 183.410 (declaratory judgment proceeding before agency).